UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

SUSAN BOND,                        )
                                   )
    Plaintiff                     )
                                   )
v.                                 )     1:11-cv-00054-JAW
                                   )
SOCIAL SECURITY ADMINISTRATION     )
COMMISSIONER,                      )
                                   )
    Defendant                     )

**REPORT AND RECOMMENDED DECISION**

The Social Security Administration found that Susan Bond, a 52-year-old woman alleging both physical and mental disability, has severe mental impairments but retains the functional capacity to perform substantial gainful activity in occupations existing in significant numbers in the national economy, resulting in a denial of Bond's application for disability insurance under Title II of the Social Security Act. Bond commenced this civil action to obtain judicial review of the final administrative decision. She maintains that the Commissioner erroneously disregarded a diagnosis of fibromyalgia and that he erroneously evaluated expert opinion evidence related to specific mental limitations. I recommend that the Court reverse the administrative decision on the latter ground.

**THE ADMINISTRATIVE FINDINGS**

The Commissioner's final decision is the September 30, 2010, decision of Administrative Law Judge John L. Melanson because the Decision Review Board did not complete its review during the time allowed. Judge Melanson's decision tracks the familiar five-step sequential evaluation process for analyzing social security disability claims. (Docs. Related to Admin.

Process, Doc. No. 8-2, R. 1.[1])

At step 1 of the sequential evaluation process, the Judge found that Bond last met the insured status requirements of Title II on June 30, 2011, and that she did not engage in substantial gainful activity during the period from her alleged onset date, June 1, 2007, through her date last insured. (R. 11-12, Findings 1 & 2.)

At step 2, the Judge found that Bond has severe mental impairments consisting of affective disorder and anxiety disorder. (R. 12, Finding 3.) The Judge otherwise found that evidence associated with fibromyalgia, degenerative disk disease, and bipolar disorder does not reliably demonstrate the existence of these conditions. (R. 12-13.) At step 3, the Judge found that this combination of impairments would not meet or equal any listing in the Commissioner's Listing of Impairments, Appendix 1 to 20 C.F.R. Part 404, Subpart P, considering specifically listings 12.04 and 12.06. The Judge did assess, however, moderate limitations in all three mental functioning categories (activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace). (R. 13-14, Finding 4.)

Prior to further evaluation at steps 4 and 5, the Judge assessed Bond's residual functional capacity. The Judge found that Bond's impairments do not restrict her ability to engage in physical exertion and enable her to understand, remember, and carry out four-step instructions, tolerate routine changes in a work setting, and interact appropriately with co-workers and supervisors, but do not allow her to engage in public interaction. (R. 14, Finding 5.) In support of this finding, the Judge purported to rely heavily on expert opinion testimony provided at the hearing by James Claiborne, Ph.D. (R. 16.)

At step 4, the Judge found that this degree of limitation precluded past relevant work as

---

[1] The Commissioner has consecutively paginated the entire administrative record ("R."), which has been filed on the Court's electronic docket in a series of attachments to docket entry 8.

an account manager, due to the complexity of the work, or as a school bus driver, because of the social demands. (R. 19, Finding 6.)

Bond was born in 1959, has a high-school-equivalency diploma, and can communicate in English. (R. 19-20, Findings 7 & 8.) The Judge presented a vocational expert with this vocational profile and the residual functional capacity findings and found, based on the vocational expert's hearing testimony, that Bond's non-exertional limitations would not significantly erode the unskilled occupational work-base and that she was capable of making a successful adjustment to other work existing in significant numbers in the national economy, based on the framework of section 204.00 of the Commissioner's Medical-Vocational Guidelines. (R. 20, Finding 10.)

## ADMINISTRATIVE BACKGROUND

Bond's claim was twice remanded by the Decision Review Board for additional development. In particular, in 2009, Administrative Law Judge John Edwards found that the record did not contain evidence of a severe impairment meeting the durational requirements of the Social Security Act. In his decision, Judge Edwards refused to accept into evidence medical records obtained from Peter Climo, D.O. (Ex. 3A, R. 144.) The Decision Review Board judged this error and found that the evidence should have been considered under the applicable regulation. (Ex. 4A, R. 154.) In addition to this finding of error, the Decision Review Board held that it was error for Judge Edwards to find that there was no evidence of a severe impairment. The finding reads as follows:

> The record *including the recent submission from Dr. Climo* contains evidence which supports a finding that the claimant has a severe impairment, contrary to the finding of the Administrative Law Judge in the decision, and does not contain substantial evidence to support a finding that the claimant has no severe mental impairment. Further, Adrianne Butler, Ed.D., a State Agency consultative examiner found that the claimant's mental health impairment would impose

3

>   moderate functional limitations across several areas (GAF 60). (2F/5) The
>   decision does not accurately reflect the findings of Dr. Butler with respect to the
>   issue of severity of the claimant's mental health impairments.

(R. 154 (emphasis added).) The order of remand directed the administrative law judge to, among other things: "Further evaluate the extent of the functional limitations attributable to the claimant's mental and physical impairments." (R. 155.) The claim returned to Judge Edwards in due course.

On November 20, 2009, Judge Edwards issued a new decision. (Ex. 5A, R. 159.) In this decision, Judge Edwards found that the only "medically determinable" impairments were right bicipital tendon irritation, affective disorder, and anxiety disorder, but that these impairments, singularly or in combination, did not significantly limit Bond's ability to perform work-related activities for 12 consecutive months. (R. 161-62.) Judge Edwards explained the basis for his decision at some length. (R. 162-65.) This did not persuade the Decision Review Board. It once more remanded the claim. It explained that Donald Trumbull, M.D., had returned an assessment for Maine Disability Determination Services that restricted Bond to light exertion and also imposed limitations related to a knee condition. According to the Decision Review Board: " Dr. Trumbull's opinions, by definition, establish that the claimant's impairments are severe, because of the limitation to work at the light exertional level, with occasional postural limitations, and the restriction in the use of her lower right extremity." (R. 182, citing Ex. 5F.) Additionally, the Decision Review Board noted that Adrianne Butler, Ed.D., who performed a consultative psychiatric examination, assessed moderate limitations in "across several areas of functioning," and found that Judge Edwards's decision did not accurately reflect these findings. (R. 183.) The Decision Review Board directed that a different administrative law judge handle the remand. (Id.) This remand order resulted in Judge Melanson's September 30, 2010, decision, presently

4

under consideration and summarized above under the heading Administrative Findings.

### DISCUSSION OF PLAINTIFF'S STATEMENT OF ERRORS

Bond's challenges are both structural and factual. She contends that the Commissioner was required to issue a decision that considered the limitations imposed by fibromyalgia because the medical records, in her view, call for a finding that she suffers from severe fibromyalgia and because, by her reading, the Decision Review Board directed such a finding in its two remand orders. Bond also challenges the residual functional capacity findings associated with her anxiety disorder, saying they are not limiting enough. Lastly, she complains that the transcript of her hearing is inadequate for review of these issues and requires a do-over. The Commissioner has not conceded any of these arguments. The Commissioner asserted at oral argument that the remand orders demanded fair reconsideration of the records and opinions associated with fibromyalgia and did not direct a finding in that regard. The Commissioner emphasizes that Judge Melanson had the benefit of a testifying medical expert and that this expert provided the Judge with a reliable basis for deciding that the evidence associated with the fibromyalgia impairment is insufficient. The Commissioner did not offer significant discussion in relation to the mental impairment question.

Based on a review of the medical records and expert assessments on file, this case is not particularly unusual, other than the circuitous decisional history. Bond's allegations of error focus on the step 2 finding and the residual functional capacity findings associated with fibromyalgia and psychiatric impairment. If those findings pass muster, Bond has not identified any independent error in the Commissioner's ultimate step 5 finding. This discussion does not address impairments not specifically addressed in Bond's Statement of Errors, such as degenerative disk disease and bipolar disorder. It concludes with a recommendation that the

fibromyalgia findings are not independently reversible, but that the assessment of residual functional capacity associated with affect and anxiety disorders is incomplete and requires remand.

**A.      Fibromyalgia**

   *1.     Expert fibromyalgia assessments*

Adrienne J. Butler, Ed.D., performed a consultative examination of Bond on July 25, 2007, at the request of Maine Disability Determination Services. Dr. Butler noted that Bond's chief complaints were of fibromyalgia and anxiety. As for fibromyalgia, Bond described a long history of fatigue and chronic pain affecting different parts of her body. She also reported a subjective experience of difficulty concentrating, maintaining attention, and retrieving information from memory. (Ex. 2F, R. 568-69.) Dr. Butler issued a medical source statement and made diagnoses concerning Bond's mental health, but those will be related in the following section regarding anxiety rather than here. Dr. Butler did identify Bond's report of physical health problems with pain as relevant DSM Axis IV psychosocial stressors impacting Bond's psychiatric health, but that diagnosis is not a diagnosis of fibromyalgia. (R. 572.)

On August 23, 2007, Edward Harshman, MD, performed a consultative examination of Bond on behalf of Maine Disability Determination Services and attempted, among other things, to assess the diagnosis of fibromyalgia. He recorded his findings as follows:

> Fibromyalgia tender points: Lateral aspect of elbow region tender; none of the other 18 points were tender. The diagnosis of fibromyalgia, per American Rheumatology Association definition, is not corroborated by my examination although those points may have been tender when the diagnosis was made.

(Ex. 4F, R. 589.) In his analysis: "I think she can stand, walk, lift, carry, climb, etc. as well as can an able-bodied wom[an] her size." (Id.)

On September 12, 2007, Donald Trumbull, MD, performed a residual functional capacity

assessment. Dr. Trumbull identified fibromyalgia as the primary diagnosis, but assessed that the symptoms would not disable Bond and would, instead, leave her with a residual functional capacity for light exertion work, six hours of sitting, and six hours of standing/walking, subject to limits on overhead reaching with the right arm and category-wide "occasional" postural limitations. (Ex. 5F, R. 590-93.) Dr. Trumbull identified Dr. Harshman's examination report as the only treating or examining source statement of record containing relevant findings. (R. 596-97.) Dr. Trumbull effectively relied on Dr. Harshman's findings and assessed that, if fibromyalgia is medically established, it imposes a non-disabling degree of limitation.

On January 30, 2009, Peter Climo, DO, of Hampden Family Medicine[2] issued a medical source statement concerning Bond's physical capacities. He assessed that fibromyalgia leaves Bond with a less-than-sedentary work capacity and does not permit even two hours of standing in a workday or six hours of sitting. Dr. Climo also assessed an inability to tolerate work postures on even an occasional basis, impairment on concentration, and a further limitation on environmental conditions. (Ex. 10F, R. 613-616.) In a letter dated February 9, 2009, Dr. Climo reported that Bond had been his patient since June 2007 and that Bond was unable to work for "as long as I have known her because of the symptomology of [her] conditions." (Ex. 12F, R. 619.) Though he recognized impairment in concentration, Dr. Climo indicated that this impairment was not attributable to medications. (Id.)

On August 19, 2010, Kathleen Bowen, FNP, completed a fibromyalgia residual functional capacity questionnaire concerning Bond. (Ex. 18F.) NP Bowen practices at Penobscot Community Health Center and Bond appears to have first sought treatment there on a periodic basis, including for an emergency visit in August 2009 with a chief complaint of intermittent jaw, neck, and left arm numbness. (R. 620, 630.) A March 2008 note describes

---

[2] Treatment notes from this practice are found in exhibit 6F.

7

Bond as a new patient, but the history contained in the note omits any reference to fibromyalgia. (R. 627.) In November 2008, NP Bowen notes complaints of fatigue and fibromyalgia, describing fibromyalgia as problem number three that day, but prescriptions issued by the practice were limited to antibiotics for the first two problems. (R. 625-26.) As for fibromyalgia, NP Bowen noted complaints of muscle aches, reported that Bond was refusing medications counseling, that participation in a support group was recommended, and that she "may [do] labs next appt." (R. 624-25.) In the fibromyalgia residual functional capacity questionnaire, signed in August 2010, NP Bowen noted that Bond's contact with the practice was infrequent, with only one visit concerning fibromyalgia. NP Bowen indicated that it was unknown whether Bond met the American College of Rheumatology criteria for fibromyalgia and that she was "not sure where dx [diagnosis] came from." (R. 702.) Clinical findings were described as "minimal." NP Bowen wrote that it was "unknown" whether Bond was a malingerer. NP Bowen was unable to offer a residual functional capacity assessment but opined that her best guess would not rule out light exertion. (R. 703-705.)

In August 2010, Bond's counsel sent her to Frank Graf, MD, for evaluation. Dr. Graf reviewed Bond's medical history and conducted an orthopedic examination. Dr. Graf described a reported history of ten years of chronic pain, starting with a fall onto a concrete surface ten years ago. Dr. Graf notes that Bond has never seen a rheumatologist for her musculoskeletal pain. Dr. Graf's first mention of fibromyalgia describes it as a part of Bond's *psychiatric* history. (Ex. 20F, R. 709.) Dr. Graf's report of findings on physical examination does not appear to be keyed to a fibromyalgia diagnosis, but he includes in his statement an assessment of "chronic musculoskeletal pain with a diagnosis of fibromyalgia." (R. 711.) Dr. Graf also submitted a medical source statement of ability to perform physical work-related activities. He

assessed a less-than-sedentary work capacity, a limitation in attention and concentration, and additional restrictions. (R. 712-715.)

The Administrative Law Judge called Peter Webber, MD, to testify at the September 8, 2009, hearing. (2010 Hr'g Tr. at 29-34, R. 88-93.) The Judge asked Dr. Webber if there was "an appropriate diagnosis of fibromyalgia." (R. 88.) Dr. Webber said he had trouble finding one and that the only examination that addressed the condition was Dr. Harshman, whose evaluation "tended to not corroborate that diagnosis." (Id.) Dr. Webber said it would be "very hard . . . to reach a definitive opinion about muscular-skeletal supported diagnosis by clinical data." (R. 88-89.) Dr. Webber also indicated that Dr. Climo's notes do not contain a "well-constructed physical examination that would support any physical diagnosis." (R. 90.) Although he acknowledged the report of symptoms, Dr. Webber agreed that it would be difficult to identify a medically determinable physical impairment. (R. 91.) On cross-examination, Dr. Webber stated that, ordinarily, fibromyalgia is diagnosed based on "the finding of pressure points and trigger points, and that type of thing," and in some cases by a newer radiological technique that is not widely used. (R. 92.) He agreed with the statement that Bond's subjective complaints of aches, fatigue, and depression can be consistent with a fibromyalgia diagnosis as can the report of waxing and waning symptoms. (Id.) Nevertheless, he emphasized that he could not "find any physical examination that show that it even is any—that even goes through it, a rheumatological type of examination." (Id.)

### 2. *Fibromyalgia discussion*

Bond argues that Judge Melanson erred in regard to his residual functional capacity finding by failing to find fibromyalgia to be a severe impairment at step 2. According to Bond, the Decision Review Board's first remand order found that Dr. Climo's records established a

severe physical impairment and this necessarily meant that Bond's fibromyalgia is a severe condition. (Statement of Errors at 4, Doc. No. 12.) Bond also notes that Dr. Trumbull's primary diagnosis was fibromyalgia, which diagnosis the Decision Review Board credited. (Id., citing Ex. 5F, R. 590.)

Remands by the Decision Review Board are discussed in 20 C.F.R. § 405.440. Subsection (b) explains that the Decision Review Board has three choices: (1) affirm if the Judge's decision is supported by substantial evidence; (2) affirm, reverse, or modify the decision if there is an error of law; or (3) remand "for further proceedings consistent with the Board's order" if the factual findings are not supported by substantial evidence. Subsection (a) explains that, in general, the Decision Review Board has authority to review legal issues *de novo*, but reviews factual findings solely to identify whether substantial evidence supports the decision.

In light of the Decision Review Board's failure to reverse the decision under review, I recommend that the Court not attempt to rule, on legal grounds, that the Judge lacked the discretion to address factual issues *de novo* on remand from the Decision Review Board. The remand orders did not expressly demand that fibromyalgia be treated as a severe, medically-determinable impairment. Additionally, the record now contains expert testimony addressing a question that is appropriately left to the experts rather than to the Decision Review Board. Judge Melanson appropriately sought out expert guidance on this issue in light of the Decision Review Board's assessment that the preexisting record did not contain substantial evidence in support of Judge Edwards's earlier treatment of the issue. By comparison, when Judge Edwards issued his earlier decisions, the only expert assessment he could rely on was the one issued by Dr. Trumbull, who appeared to give the claimant the benefit of the doubt, while still offering a residual functional capacity assessment that would ordinarily correspond with a not-disabled

10

outcome, at least as far as physical ability is concerned. Now, the Record includes an expert evaluation of the issue of medical determinability, a step 2 consideration, which has been offered in light of additional records developed up to the 2010 hearing date.

At step 2, the Commissioner must consider the severity of a claimant's impairments and it is the claimant's burden to prove the existence of a severe, *medically determinable*, physical or mental impairment or severe combination of impairments that meets the durational requirement of the Social Security Act. 20 C.F.R. § 404.1520(a)(4)(ii). The Commissioner's regulations explain: "Your impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms." Id. § 404.1508. The Commissioner has explained in a policy interpretation ruling:

> No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.

Social Security Ruling 96-7p, 1996 SSR LEXIS 4, *1, 1996 WL 374186, *1 (S.S.A. July 2, 1996). "Symptoms are [a claimant's] own description of [his or her] physical or mental impairment." 20 C.F.R. § 404.1528(a). A claimant's "statements alone are not enough to establish that there is a physical or mental impairment." Id. By contrast: "Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques." Id. § 404.1528(b).

Dr. Webber's testimony is substantial evidence in support of Judge Melanson's finding

that Bond's assertion of fibromyalgia is not supported by clinical signs and acceptable diagnostic techniques because a reasonable person might well accept that testimony as adequate to prove the fact. An independent review of the record does not compel a contrary finding. Simply stated, the quality of the remaining evidence related to fibromyalgia is not strong.

Bond cites Johnson v. Astrue, in which the First Circuit observed that treatment providers necessarily consider a patient's subjective complaints when diagnosing fibromyalgia and that "trigger points *are* the only 'objective' signs of fibromyalgia." 597 F.3d 409, 412 (1st Cir. 2009). However, the Circuit Court did not hold in Johnson that a fibromyalgia diagnosis could never be found "not medically determinable" where the record did not disclose a proper diagnosis that relied on appreciable or "multiple" trigger-point findings. Id. at 411.

**B.     Anxiety**

   *1.     Expert anxiety assessments*

As previously noted, Dr. Butler performed a consultative psychiatric examination in July 2007. (Ex. 2F.) Dr. Butler's Axis I, DSM "diagnostic impression" was that Bond has Generalized Anxiety Disorder with Panic Attacks, PTSD and Mood Disorder NOS. In her medical source statement, Dr. Butler opined that Bond was "apt to be able to understand and carry out tasks consistent with Low Average to Average ability[;] . . . to have difficulty with the retention of new information[;] and . . . [to] likely need multiple repetition and reinforcement in order to transfer the information into short-term and then long term memory storage." (R. 572.) Dr. Butler also reported that "Bond has observable intermittent attention and concentration difficulties and may have some problems with sustaining task focus." (Id.) Finally, Dr. Butler believed that Bond would not work well in "large group situations in which her anxiety is apt to heighten." (Id.)

In August 2007, Brenda Sawyer, Ph.D., performed the Commissioner's psychiatric review technique. (Ex. 3F.) She opined that Bond's psychiatric conditions are "not severe" for social security disability purposes because they impose only mild social limitations and mild concentration, persistence, and pace limitations. (R. 574.) Dr. Sawyer's opinion was effectively set to the side by the Decision Review Board. The record lacks any subsequent referral to a consulting expert to perform the psychiatric review technique and supply a mental residual functional capacity assessment.

In December 2008, William DiTullio, Ed.D., issued a medical source statement (mental) for the Commissioner's consideration. (Ex. 8F.) Dr. DiTullio described Bond as markedly limited in a number of mental abilities in all three categories based on diagnoses of PTSD, major depression, and "atypical" anxiety that includes Agoraphobia and panic attacks. (R. 608-609.) In his narrative comments, Dr. DiTullio emphasized that Bond has severe concentration and recall difficulties, cannot handle social exposure, and is highly sensitive to criticism. (R. 609.) Dr. DiTullio also authored a report of psychiatric evaluation in December 2008, which indicates that his report was directed to, and requested by, Bond's counsel. (Ex. 9F.) Thus, Dr. DiTullio is an independent consultant rather than a "treating source." Dr. DiTullio's report described a troubled childhood history and persistent difficulties in adulthood associated with depression, chronic pain, anxiety, and flashbacks to traumatic experiences. (R. 610-11.) His report relates Bond's subjective complaints associated with concentration, poor memory, and panic reactions in public settings. (R. 611.)

Dr. Climo, a treating physician, completed a medical source statement of Bond's mental ability, as well as the physical assessment described in the fibromyalgia discussion. He indicated that he regarded Bond as markedly limited in every work-related capacity listed on the form,

except for the ability to carry out short and simple instructions. (R. 617-18.) As previously noted, Dr. Climo issued a medical report for social security purposes in which he expressed the opinion "that [Bond] could not fulfill a 40 hour work week on an ongoing basis even in the most sedentary fashion due to the symptoms of [her] conditions." (Ex. 12F, R. 619.)

The Administrative Law Judge called James Claiborn, Ph.D., to testify at the September 8, 2010, hearing. (2010 Hr'g Tr. at 21-29, R. 80-88.) After questioning Bond concerning some of her symptoms, Dr. Claiborne testified that an anxiety disorder is established in the nature of post-traumatic stress disorder and that an affective disorder is also present in the nature of a depressive disorder, not otherwise classified. (R. 85.) He also indicated that the proper treatment of Bond's PTSD would be cognitive behavioral therapy and noted that the records did not indicate "that there had been much attention to that." (R. 86.) Asked to address the considerations outlined in the Commissioner's psychiatric review technique, Dr. Claiborne opined that there is moderate impairment in activities of daily living, social functioning, and concentration, persistence, and pace. (R. 86.) From there, Dr. Claiborne opined that Bond could handle simple instructions involving up to four-step operations. (R. 87.) Socially, he believes that Bond could handle social interaction with co-workers and supervisors and could tolerate routine change in a work setting, but could not handle social interaction with the public. (Id.) He opined that she could tolerate routine changes in the workplace. (Id.) He also opined that Bond's condition would be capable of improvement with appropriate treatment, but that it could take more than a year to realize the benefit of treatment. (R. 87-88.) The Judge then turned the questioning over to counsel, without addressing Bond's capacity for sustained concentration and persistence. During counsel's cross-examination, Dr. Claiborne testified that, as of the date of hearing, given the lack of treatment, Bond was likely to respond to stress in an unproductive

14

manner, which would tend to cause her to be absent from or leave the workplace on occasion. (R. 93.) He also agreed with the assessment offered by Dr. Butler that Bond is going to have some problems with short-term memory and concentration. (R. 94.)

   *2.    Anxiety discussion*

The Judge's residual functional capacity finding accounts for severe disorders of both affect and anxiety by imposing restrictions limiting Bond to tasks involving no more than four-step instructions and tasks. In this regard, his finding is supported by substantial evidence in the form of Dr. Claiborne's testimony. The Judge additionally precluded occupations that would require public interaction, thereby acknowledging a limitation related to social anxiety. Once again, Dr. Claiborne's testimony supplied substantial evidence for the finding, and Dr. Butler's report of examination appears to back this up. However, there remains a question with respect to Bond's ability to sustain concentration and persistence, and the Record lacks a reliable expert opinion on Bond's mental residual functional capacity that would support the Judge's exclusion of concentration and persistence limitations. These concerns are reflected in Dr. Butler's opinion that Bond would have observable intermittent attention and concentration difficulties and problems with sustaining task focus. There is also a concern for Bond's ability to handle stress and utilize her short-term memory. On these issues, Dr. Claiborne merely testified that Bond suffers moderate limitations in concentration, persistence, and pace for purposes of the Commissioner's psychiatric review technique, without focusing his evaluation for purposes of a residual functional capacity assessment. Additionally, Dr. Claiborne testified that Bond is unlikely to respond productively to stress in the workplace, could choose to leave rather than work through her stress, and is going to have some trouble with short-term memory, problems that might be overcome with therapy but that would endure for more than a year while therapy

15

progressed. With the exception of Dr. Sawyer's opinion on the psychiatric review technique form, clearly rejected by the Commissioner, all of the other expert opinion evidence supports Dr. Claiborne's view that Bond will experience these severe concentration and persistence difficulties to a moderate or greater extent.

In his decision, Judge Melanson found that Bond's mental impairments impose moderate limitations in all three functional categories. (R. 13, Finding 4.) Thereafter, in his discussion of Bond's residual functional capacity, the Judge derived his finding based on a credibility determination concerning the intensity, persistence and limiting effects of Bond's reported symptoms. (R. 15.) In this regard, the Judge not only assessed Bond's testimony, but also canvassed the longitudinal record. He was able to identify isolated entries in the medical records describing Bond as a person with good insight and judgment, a normal attention span, and "grossly intact" memory. (R. 15.) From there, the Judge recited his reliance on the following factors: (1) absence of psychiatric hospitalizations; (2) contraindication of medication side effects; (3) Global Assessment of Functioning scores between 56 and 60; (4) inconsistent compliance with medication treatment; (5) the testifying expert's opinion; (6) multiple attempts to obtain out-of-work notes despite infrequent treatment; (7) the physical and emotional demands of Bond's activities of daily living, including a full-range of household responsibilities, home-schooling responsibilities, and book-writing aspirations; (8) that Dr. Climo's residual functional capacity assessment was extreme in comparison to any of his treatment notes in the Record; (9) Dr. Butler's medical source statement, which received "some weight"; and (10) that Dr. DiTullio's assessment was heavily based on Bond's subjective complaints.

Despite the foregoing discussion of the usual factors, in the absence of a persuasive expert assessment of concentration, persistence, and pace limitations on a functional basis, it

appears that Bond may well have a combination of mental impairments that meets the disability standard, including the duration standard, albeit one that may be amenable to treatment. The Commissioner's regulations promise that the Commissioner will "consider your ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. §§ 404.1545(a)(4). The Commissioner has issued a policy interpretation ruling explaining that a residual functional capacity assessment requires identification of a claimant's functional limitations and assessment of work-related abilities "on a function-by-function basis." Social Security Ruling 96-8p, 1996 SSR Lexis 5, *2, 1996 WL 374184, *1 (S.S.A. July 2, 1996).[3] While it is not mandatory for an administrative law judge to discuss every physical and mental demand of work in the course of a decision, the Commissioner must at least satisfy the "function-by-function" inquiry by seeking one or more assessments of work functioning from qualified experts during the claims process. These assessments are commonly reported on a form that facilitates a "function-by-function" review, namely the residual functional capacity assessment forms. Nowhere in the Record is there a mental residual functional capacity assessment form (Form SSA-4734-F4-SUP, available online) completed by an expert. Moreover, in my view, Dr. Claiborne's limited testimony at the hearing did not supply an equivalent assessment.[4] The Judge sought to fill this void in his decision by reviewing the medical records himself, but in the absence of reliable underlying expert opinion, his lay inferences concerning the longitudinal record and credibility assessment

---

[3] Bond has not specifically raised the Ruling in her statement of errors. However, her argument is essentially to the same effect; that the Commissioner failed to adequately identify and assess specific functional limitations related to attendance and information retention, whereas her own experts specifically addressed these concerns and described a disabling degree of impairment.

[4] Dr. Claiborne's testimony referring to moderate limitation in the three categories of mental work-function was a shorthand reference to the Commissioner's psychiatric review technique, which addresses the Listings at step 3, and was not a function-by-function assessment related to the concentration, persistence, and pace residual functional capacity subcategories that are identified in the Commissioner's mental residual functional capacity assessment form. Further examination of these subcategories is warranted in this case based on the general agreement among the experts, including Dr. Claiborne, that specific concentration, persistence, and pace functions are at least moderately impaired. The fact that these limitations may be amenable to treatment is not claim dispositive.

are not substantial evidence. In effect, the testimony elicited during cross examination of Dr. Claiborne undercuts the Judge's reliance on Dr. Claiborne to support his decision to exclude limitations related to sustained concentration and persistence, including limitations related to stress, memory and attendance. This is not to say that the Judge's analysis is necessarily unreasonable, only to say that a critical evidentiary piece is missing because there is no reliable means of knowing that Dr. Claiborne agreed with the Judge's exclusion of additional concentration and persistence limitations and there is no other expert opinion in the Record concerning Bond's mental residual functional capacity that the Judge could fall back on to support this finding. "The ALJ's findings of fact are conclusive when supported by substantial evidence, but they are not conclusive when derived by . . . judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).

## Conclusion

For the reasons set forth in the foregoing discussion, I RECOMMEND that the Court reverse the Commissioner's administrative decision and remand for further proceedings consistent with the foregoing discussion.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

January 30, 2012